J-S08044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.C., NATURAL FATHER | : | No. 1582 WDA 2016 |

Appeal from the Order Dated September 23, 2016
In the Court of Common Pleas of Allegheny County
Civil Division at No(s):  CP-02-AP-061-2016

BEFORE:   GANTMAN, P.J., FORD ELLIOTT, P.J.E., and SOLANO, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED JANUARY 30, 2017**

Appellant, P.C. ("Father"), appeals from the order entered in the Allegheny County Court of Common Pleas, which granted the petition filed by the Allegheny County Office of Children, Youth, and Families ("CYF") for involuntary termination of Father's parental rights to his minor child, L.C. ("Child").  We affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Father raises one issue for our review:

> DID THE TRIAL COURT ABUSE ITS DISCRETION AND/OR ERR AS A MATTER OF LAW IN CONCLUDING THAT TERMINATION OF [FATHER'S] PARENTAL RIGHTS WOULD SERVE THE NEEDS AND WELFARE OF CHILD PURSUANT TO 23 PA. C.S.[A.] § 2511(B)?

(Father's Brief at 5).

J-S08044-17

Appellate review of termination of parental rights cases implicates the

following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972

A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings

- 2 -

are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYF filed a petition for involuntary termination of Father's parental rights to Child on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)  General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

*       *       *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

*       *       *

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve

- 3 -

the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b).[1]

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond,

---

[1] Father challenges the court's termination decision only under Section 2511(b).

paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his… rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental

duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with…her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of…her potential in a permanent, healthy, safe environment." *Id.* at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Donald R. Walko, Jr., we conclude Father's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, filed November 16, 2016, at 8-13) (finding: during two years following Child's placement with maternal grandparents, Father made minimal progress with his family service plan goals; court had serious concerns regarding Father's ability to provide stable

environment necessary for Child's physical and mental wellbeing; Father acknowledged to Dr. O'Hara on March 22, 2016, that Father was not in position to care for Child; during pendency of case, Father admittedly struggled to achieve sobriety, was homeless, and panhandled for money; these behaviors are not safe or conducive to Child's wellbeing, and display repeated and continued incapacity to provide Child with essential care; record suggests Father is still struggling to achieve and maintain sobriety; Father had opportunity for two years to remedy his problems and adequately support Child's needs, but he failed to do so; Dr. O'Hara testified adoption outweighs any potential detriment related to termination of Father's parental rights to Child; Dr. O'Hara testified Father's lack of stability and security poses threat to Child's emotional and behavioral needs, including risk of homelessness, lack of school-readiness, anxiety, depression, and reactive attachment disorder; Child has lived in maternal grandparents' custody for majority of her life; Child displayed signs of secure attachment to maternal grandparents as caregivers, who provide Child with stable and nurturing environment; Father attended only 70% of his scheduled visits with Child; court found no substantial bond between Father and Child; termination of Father's parental rights best serves Child's developmental, physical, and emotional needs).  Accordingly, we affirm on the basis of the trial court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/2017

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION – JUVENILE SECTION

IN THE INTEREST OF: L.C., a minor child,

**CHILDREN'S FAST TRACK APPEAL**

APPEAL OF: P.C., natural father

No.: CP-02-AP-061-2016
FID: 02-FN-092189-2010
JID:

## OPINION

WALKO, J.

November 7th, 2016

## I. PROCEDURAL HISTORY

This appeal stems from the involuntary termination of the parental rights of the natural father, P.C. ("Father") to L.C. (D.O.B.: 11/  2013) ("the Child"). Allegheny County Office of Children, Youth and Family Services ("CYF") has been involved with this family since November of 2013. Father was initially compliant with the family plan goals established by CYF. On June 8, 2014 the Child was again referred to CYF after both of the Child's parents were involved in an accident and admitted to being under the influence of narcotics. The Child was removed and placed with her maternal grandparents.

The Child was adjudicated dependent on September 8, 2014. *See* Order of Court, dated September 8, 2014. The Permanent Placement Goal for the Child was to return her to her parents. *See* Order of Court, dated December 2, 2014.

In the two years following the adjudication of dependency the Court held multiple Permanency Review Hearings. Father made little to no progress toward accomplishing the established family plan goals. On March 24, 2015, the Court held a Permanency Review Hearing

1

and found that Father had been minimally compliant with the permanency plan. *See* Permanency Review Order, dated March 24, 2015. Another Permanency Review Hearing was held on June 16, 2015 and the Court found that Father had made "minimal progress toward alleviating the circumstances which necessitated the original placement." *See* Permanency Review Order, dated June 16, 2015. On October 13, 2015 the Court again held a Permanency Review Hearing and again found Father to be minimally compliant with established goals.[1] *See* Permanency Review Order, dated October 13, 2015.

On April 12, 2016, the Court again found Father to have made "minimal progress toward alleviating the circumstances which necessitated the original placement" of the Child. *See* Permanency Review Order, dated April 12, 2016. On April 12, 2016 the Court determined that adoption would be the new permanent placement goal. *Id.* CYF subsequently filed a Petition for Termination of Parental Rights. On September 23, 2016, following a hearing on the Petition, this Court entered an Order terminating the parental rights of Father to the Child. The Court further awarded custody of the Child to CYF in order to initiate adoption proceedings. Termination of Father's parental rights also extinguished his right to object to or receive notice of adoption proceedings regarding the Child. *See* Order of Court, dated September 23, 2016. Father appeals.

Father contends that this Court abused its discretion or erred as a matter of law when it determined that termination of Father's parental rights would serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b). *See* Father's Concise Statement of Matters Complained of on Appeal, at Paragraph 1. For the following reasons, this Court's Order should be affirmed.

---

[1] The Order of Court states that "[t]here has been minimal compliance with permanency plan, in that Father has not signed releases of information for the agency. Father does not submit to random urine screens. Father does not maintain contact with the agency."

## II. FACTS

### a. Allegheny County Office of Children, Youth and Family Services

Amber Saunders, a CYF Caseworker assigned to the case, testified regarding the circumstances under which the Child became involved with CYF and Father's progress thereafter[2]. Ms. Saunders testified that CYF began working with the family in November of 2013 due to both parents' issues with drugs and alcohol. *See* T.P.R. Hearing, 8/23/16, at 8. Ms. Saunders testified that CYF initially became involved because the agency was informed that the Child had tested positive for cocaine and opiates at birth. *Id.* at 9. The Child's mother was in drug treatment prior to giving birth. *Id.* With respect to Father, CYF established "family service plan goals" which included completing drug and alcohol and mental health evaluations, attending parenting classes and scheduled visits, acquiring stable and appropriate housing and maintaining contact and cooperation with CYF. *Id.* at 10. Ms. Saunders testified that Father was initially compliant with the family plan goals. *Id.* at 11, 12. On June 8, 2014, however, both parents were involved in a car accident. *Id.* at 8. Father was driving when he rear-ended another vehicle that was stopped in front of him. *Id.* The Child's mother was admitted to the intensive care unit and disclosed her use of Subotex and heroin. *Id.* Father was "allegedly under the influence of an unknown substance" at the hospital which was evidenced by erratic behavior and falling asleep while holding the Child. *Id.* CYF was notified of the incident and Father admitted that he had been "high on Vicodin" and had taken a handful of sleeping pills. *Id.* Ms. Saunders testified that it was clear that Father had relapsed and CYF wanted him to readdress his issues accordingly. *Id.* at 11, 12. The Child was removed from her parents care and placed in the custody of her maternal grandparents. *Id.*

---

[2] Ms. Saunders testified on the first day of a two-day hearing. Citations to her testimony refer to the transcript from the Termination of Parental Rights Hearing of 8/23/2016.

Based on Father's self-reported drug use CYF again established family plan goals. *Id.* Specifically, CYF wanted Father to continue drug and alcohol treatment. *Id.* Father, however, refused to sign a release to give CYF access to his medical records. *Id.* Father reported to CYF that he was "clean" and that he had completed drug screens, but CYF had no way of confirming this information without Father's release. *Id.* CYF provided Father with contact information and resources for mental health providers. *Id.* at 24. Both parents were accepted to Pennsylvania Organization for Women in Early Recovery ("POWER"). *Id.* at 26. POWER reported to CYF, however, that they were unable to reach Father. *Id.* CYF never received confirmation of Father's POWER assessment. *Id.* KidsVoice, a non-profit children's advocacy agency, subpoenaed Father's information during a court hearing and CYF was finally able to access it. *Id.* at 28. Father attended Tadiso, an outpatient opioid treatment facility, for methadone maintenance from November of 2014 until January of 2015. *Id.* at 23. Father attended but had not successfully completed mental health treatment at Mercy Behavioral Health ("Mercy") in the spring of 2015. *Id.* at 28. Father was called for seventy (70) drug screens and attended only nineteen (19). *Id.* at 24.

CYF had established goals for Father to obtain stable and appropriate housing and provided both Mother and Father with information for shelters and other programs. *Id.* at 10. Father's housing has been unstable throughout the pendency of this case. *Id.* at 29. Father had housing with the Child's mother from May of 2015 until February of 2016 when the couple was evicted. *Id.* Following the eviction Father was "transitionally homeless" and was staying with different friends. *Id.* Ms. Saunders testified that Father obtained housing with the Child's mother in July or August of 2016. *Id.* at 29.

With respect to visitation, CYF had established goals for Father to attend parenting classes and scheduled visits and to maintain contact and cooperation with the agency. *Id.* at 10. The parents

4

always visited the Child together. *Id.* at 30. Visits were initially required to be supervised until August of 2015. *Id.* Father participated in supervised parenting visits at Arsenal Family and Children's Center ("Arsenal"). *Id.* at 28. He successfully completed the Arsenal program on May 16, 2015. *Id.* From August 2015 until March of 2016 the parents were permitted to have unsupervised community visits. *Id.* CYF reverted back to supervised visits due to safety concerns when the parents were evicted and homeless. *Id.* The parents visited the Child at the CYF East Office thereafter. *Id.* at 30. CYF had also recommended that Father attend the Three Rivers Adoption Council ("TRAC") for individual and family therapy. *Id.* at 33. Father, however, failed to engage the services of TRAC. *Id.* CYF had continuous issues with visitation. *ID.* The parents constantly confirmed visits and then failed to arrive as scheduled. *Id.* The Child would be taken to the CYF office for a confirmed visit and the parents would often never show. *Id.* CYF attempted to solve the problem by requiring the parents to confirm visits 24 hours ahead of time. *Id.* at 31. Even then, however, there were times when they would not appear. *Id.* CYF had difficulty communicating with parents and did not have a working telephone number for them. *Id.* Ms. Saunders testified that the parents attended only 132 of the 187 scheduled visits—"about 70%." *Id.* at 30. The parents were initially given visitation twice per week: Thursdays from 4:00 PM until 7:00 PM and Sundays from 12:00 PM until 2:00 PM. *Id.* By the time of the hearing, however, the visits were reduced to once a week due to lack of progress. *Id.* at 38. The most recent visit occurred on August 18, 2016. *Id.* That visit ended early because a CYF caseworker had concerns with the parents' interaction with the Child. *Id.* at 56. A confrontation ensued between the parents and the caseworker when the caseworker terminated the session. *Id.*

Given the above information Ms. Saunders testified that Father had not successfully completed the CYF family service plan goals. *Id.* at 33. By the time of the hearing, CYF remained

5

concerned that they could not confirm whether or not Father was still abusing drugs and that he had a history of instability. *Id.*

### b. Psychological Evaluations

Dr. O'Hara is a licensed psychologist in Pennsylvania who evaluated all of the parties involved in this case.[3] (*See* T.P.R. Hearing, 9/13/2016). Dr. O'Hara performed an interactional evaluation with the Child and the maternal grandparents on March 1, 2016. *Id.* at 4. Dr. O'Hara testified that the maternal grandparents "presented with stability" and had no history of substance abuse or criminal activity. *Id.* at 4-6. The maternal grandparents displayed positive parenting skills and were both engaging. *Id.* at 6. Dr. O'Hara further testified that the Child displayed "all indicators of secure attachment" to her grandparents as caregivers. *Id.*

Father participated in an individual evaluation with Dr. O'Hara on March 22, 2016. *Id.* at 4. Dr. O'Hara testified that there were a variety of concerns surrounding Father. *Id* at 5, 10. Father disclosed his criminal history which includes two convictions for driving under the influence ("DUI"), harassment, disorderly conduct, simple assault, possession of an instrument of a crime and possession of drug paraphernalia. *Id.* at 10. Father also had periods of homelessness and mentioned recent "panhandling" for money. *Id.* Dr. O'Hara testified that Father was unwilling to assume responsibility for his circumstances regarding the removal and ongoing placement of the Child. *Id.* During the evaluation Father admitted that alcohol and pain medications cloud his judgment and he acknowledged being on methadone or suboxone for three years. *Id.* Father also admitted to taking Vicodin three weeks prior to the evaluation and could not be sure of his "clean time." *Id.* Father's personality assessment reflected "impulsivity, alcohol abuse and substance abuse in general." *Id.* at

---

[3] Dr. O'Hara testified on the second day of a two-day hearing. Citations to his testimony refer to the transcript from the Termination of Parental Rights Hearing of 9/13/2016.

6

10, 11. Dr. O'Hara diagnosed father with "opioid disorder moderate, on maintenance therapy [and] alcohol use disorder severe." *Id.* at 11.

Dr. O'Hara performed an interactional evaluation with Father and the Child on March 22, 2016. *Id.* He testified that Father displayed positive parenting skills, that he was playful and calm and that he showed affection well. *Id.* Dr. O'Hara testified, however, that he had substantial concerns regarding Father's stability. *Id.* at 12. Specifically Dr. O'Hara was concerned that Father still showed signs of being unable to care for the Child despite her being removed for two years. *Id.* Father acknowledged that he was not in a position to care for the Child. *Id.*

Dr. O'Hara considered all of the information from CYF, discussed *supra*, and additional information from KidsVoice in rendering his opinion. *Id.* at 12, 13. He testified that he received reports from KidsVoice that Father was not attending treatment outside of his methadone or suboxone clinics. *Id.* In Dr. O'Hara's opinion this type of treatment is "substandard" on its own. *Id.* at 13. He also considered the evaluations and the level of attachment between the Child and the maternal grandparents as caregivers. *Id.* He testified that without security and stability for children they are at risk for a variety of problems which include a "lack of school readiness, behavioral issues, depression and anxiety and reactive attachment disorder." *Id.* at 15. Based on the foregoing Dr. O'Hara concluded that the benefits of adoption for the Child with the maternal grandparents outweigh the potential detriment of terminating Father's parental rights. *Id.* at 16. Dr. O'Hara made these recommendations and came to these conclusions based upon a reasonable degree of psychological certainty. *Id.*

7

### c. Father's Testimony

Father testified[4] that his "clean date" is February 17, 2016 and that he completes urine screens "maybe twice a month." *See* T.P.R. Hearing, 9/13/2016, at 30. He further testified that he is in treatment at Mercy and that he had previously terminated treatment due to lack of insurance. *Id.* at 31. He stated that he participates in group therapy and is not on suboxone maintenance. *Id.* at 31, 32. Father is now employed at a cemetery full-time and has acquired stable housing. *Id.* at 32. He testified that he is "finally at a stage in life that he has learned from his past mistakes and wants nothing but good for his family and his future." *Id.* at 33. He stated that he wants "a chance to do that." *Id.*

## STANDARD OF REVIEW

The standard of review in a termination of parental rights case is that of an abuse of discretion. The Supreme Court of Pennsylvania confirmed the standard of review as follows:

> [w]hen reviewing an appeal from a decree terminating parental rights, [the Superior Court is] limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, [the Superior Court] must accord the hearing judge's decision the same deference that it would give to a jury verdict. [The Superior Court] must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of S.P.*, 616 Pa. 309, 317 (2012) (quoting *In re: B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004)).

## DISCUSSION

In considering a petition for termination of parental rights a trial court is charged with determining whether grounds for termination have been established by clear and convincing

---

[4] Father testified on the second day of a two-day hearing. Citation to his testimony refers to the transcript from the Termination of Parental Rights Hearing of 9/13/2016.

evidence under 23 Pa.C.S. § 2511(a). The Court shall give "primary consideration to the developmental, physical and emotional needs and welfare of the child." Id. at § 2511(b). The statute further provides nine (9) grounds for termination. Id. at § 2511(a). A petitioning party need only establish one of the nine grounds to support a claim for termination of parental rights. Id. In this case, the Court found that Father's parental rights should be terminated pursuant to § 2511(a)(2), (5) and (8).

Under § 2511(a)(2) a trial court may terminate parental rights based on clear and convincing evidence that the

> [r]epeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

The Child was days old when this case was initially referred to CYF in November of 2013. As discussed *supra*, CYF established family service plan goals and Father was initially compliant. It became clear, however, in June of 2014 that Father had relapsed when he caused a car accident. Father had been driving while under the influence of narcotics. Following the accident, Father was unable to stay awake at the hospital and fell asleep with the Child in his arms. The Child was taken into custody by CYF and placed with maternal grandparents. During the two years following the placement Father has made little to no progress with respect to established family service plan goals. Ms. Saunders, a CYF caseworker, and Dr. O'Hara, a psychologist, both testified regarding Father's lack of progress. Given the amount of time that the Child has been in placement and the testimony at the hearing, this Court has serious concerns regarding Father's ability to provide a stable environment necessary for the physical and mental wellbeing of the Child. During the pendency of this case Father has admittedly struggled to achieve sobriety, has been homeless and has panhandled for money. None of these behaviors are safe or conducive to the wellbeing of the Child. These

9

behaviors display a repeated and continued incapacity to provide essential care. Father has attended 70% of the scheduled visits with the Child and has been largely noncompliant and uncooperative with CYF's contact and communication goals. As recently as March 22, 2016, Father acknowledged to Dr. O'Hara that he was not in a position to care for the Child. Despite Father's subsequent attempts, it was apparent at the time of the hearing that these issues had not been adequately remedied by Father.

Section 2511(a)(5) of the statute enables a trial court to terminate parental rights based on a finding that

> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

As discussed *supra*, the Child was removed from Father's care in June of 2014 and has since been placed with her maternal grandparents. The period of removal far exceeds the 6-month threshold provided for in the statute. Despite the efforts of CYF, KidsVoice and Dr. O'Hara, Father continued to display the behavior that warranted removal of the Child in the first place. Father disregarded the advice of CYF to contact TRAC for additional parenting assistance. Father refused to release medical information that would confirm or deny any drug usage. The Court is cautious to accept Father's claims of sobriety. Father testified that his "clean date" is February 17, 2016. Dr. O'Hara testified, however, that during Father's evaluation on March 22, 2016 Father disclosed using Vicodin three weeks prior to the evaluation and was "unsure about clean time." It appears that given Father's history of instability and inconsistency he is still struggling to achieve and maintain sobriety. This case has been pending with CYF since the removal of the Child in 2014.

10

Father has had two years, therefore, to become sober and stable. The Court finds that two years is more than a reasonable amount of time to remedy Father's problems in order to adequately support the needs of the Child.

Dr. O'Hara testified that adoption at this point outweighs any potential detriment of the termination of parental rights. The Child has become attached to the maternal grandparents as caregivers. Maternal grandparents provide a stable and nurturing environment for the Child. The lack of stability and security offered by Father pose a threat to the emotional and behavioral needs of the Child. Based on the foregoing the Court determined that termination of Father's parental rights serves the needs and welfare of the Child.

Under § 2511(a)(8) a trial court may terminate parental rights based upon a finding of clear and convincing evidence that

> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

The Court applied the same reasoning under §2511(a)(8) as under §2511(a)(5) in determining that clear and convincing evidence had been presented to warrant a termination of Father's parental rights. In the interest of clarity the Court reiterates that two years have elapsed since the Child was removed from Father's care. CYF and Dr. O'Hara testified regarding their concerns for Father's progress and lack of stability. Both CYF and Dr. O'Hara opined that Father was not in any position to appropriately care for the Child. Given Father's drug and alcohol history, criminal background and lack of progress within a two-year period the Court determined that terminating Father's parental rights serve the needs and welfare of the Child.

11

As stated *supra*, Pa.C.S. § 2511(b) requires a court to consider the developmental, physical and emotional needs and welfare of the child. The Superior Court of Pennsylvania has established that a trial court must consider the emotional bond, if any, between the parent and child as a factor in determining the needs of a child.

The Court first considered the age of the Child during the pendency of this case. As stated *supra* the Child was days old when the case was first referred to CYF. She was removed and placed with her maternal grandparents on June 8, 2014. The Child was less than seven (7) months old at the time of her removal and was nine (9) months old when she was adjudicated dependent. The Child has spent the majority of her life in the custody of her maternal grandparents. Father was given the opportunity to visit the Child during that time but has only attended 70% of his scheduled visits. Due to the age of the Child and Father's willful lack of visitation, the Court finds that there is not a substantial bond between Father and the Child.

Dr. O'Hara testified that Father displayed positive parenting skills and that he was playful, calm and affectionate. Dr. O'Hara testified, however, that the Child displayed signs of secure attachment to her maternal grandparents as caregivers. While Father's positive interactions are noted, the Court finds that Child has a strong bond with her maternal grandparents. Given the age of the Child and her attachment to her maternal grandparents, the Court finds that termination of parental rights best serves the developmental, physical and emotional needs of the Child.

## CONCLUSION

The law is clear that the purpose of dependency actions is to determine a permanent placement that best serves the needs and welfare of the child. The purpose is not to hold children in foster care until their parents get sober or become adequate caregivers no matter how long it takes. The Court determined that the termination of Father's parental rights was necessary to serve the

12

interests of the Child. For the foregoing reasons, this Court respectfully requests that Father's appeal be denied and the decree terminating his parental rights to the Child be affirmed.

BY THE COURT:

_____, J.

13